1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

MORIA ROGERS,                                     CASE NO. 1:10-cv-00589-SMS

               Plaintiff,                ORDER DENYING PLAINTIFF'S MOTION
                              TO SANCTION DEFENDANT FOR
   v.                                             DESTRUCTION OF EVIDENCE

SEIBERT FAMILY TRUST 1995, et al.,
                              (Docs. 41 and 42)
               Defendants.
_____/

      Plaintiff Moria Rogers moves this Court for an order sanctioning Defendants for destroying copies of video surveillance of Rogers' rented trailer in Defendants' mobile home park.  Defendants respond that, since indicating that the recordings were lost or destroyed, they were able to locate the recordings and have provided copies to Rogers.  Rogers replies that Defendants have given her fewer than the number of recordings that she expected in light of Defendant Leslie Seibert's deposition statement that he had retained copies of surveillance tapes that interested him.  Because no evidence supports the conclusion that Defendants lost or destroyed any video surveillance recordings, the Court denies Rogers' motion for sanctions.

///
///
///
///

1

## I.   Procedural and Factual Background

In April 2005, Moria Rogers,[1] the plaintiff in this action, purchased a mobile home parked on a leased lot in Sierra Hide-Away Mobile Home Park, which was managed by Defendant Leslie Seibert, who is also a member of its owning partnership.  Disagreements between Rogers and Seibert developed almost immediately.  Although many details of the parties' relationship figure in the case as a whole, this motion only relates to Plaintiff's claim that Defendants invaded her privacy by installing video surveillance system intended to observe activities in Rogers' home.

On July 5, 2009, Seibert provided a letter to all tenants, indicating that park management had observed a need for identification and documentation of activities in the park. Citing reports of a possible theft and of an outsider who had entered the park and knocked on a tenant's door at 4:00 a.m., Seibert disclosed that management intended to install video surveillance equipment and solicited the tenants' comments on the matter.  In her response, Rogers declared that taping her would be an invasion of her privacy and accused Seibert of "aggressive and obsessive stalking behavior."  Doc. 44-5.

On July 18, 2009, Seibert reported to the tenants, among other matters, that eighteen of nineteen tenants who responded to his inquiry favored installation of video surveillance equipment.  Seibert stated:

> We are going to do what we can to provide security and a feeling of safety.  For any others that do not want surveillance in this park I can only say with all the kindness I can, that surveillance cameras are going to be installed as soon as possible.  And that is a fact.  And surveillance is going to be time dated and recorded 24/7.  What we are doing is providing security and proof of events for everyone who lives in this park.  This is an adult park age 55 years and older, no children and that is why a number of you selected this park.  But a number of you have also expressed to me that as your age has advanced you feel more vulnerable, especially as we have observed our society become more angry and violent.  Surveillance does not necessarily stop crime, but often de[ter]s the crime because of the surveillance.  And de[ter]ing of crime is a good thing.

Doc. 44-3 at 2.

---

[1] In the course of the events underlying this action, Rogers has used both her maiden name, Moria Rogers, and the name Moria Isaksson.  (Rogers apparently resumed use of her maiden name after filing a divorce complaint in 2008.)  To minimize confusion, the Court will consistently refer to the Rogers in this action using her current name, Moria Rogers.

On July 27, 2009, Rogers, who was then pregnant, complained to Defendant Leslie Seibert, the park manager, that, among other things, the privacy of her master bedroom had been compromised by the installation of video surveillance cameras in the park and removal of landscaping that screened her home from the street.

On or about August 27, 2009, Rogers gave birth. She continued to live in her mobile home with her infant. On December 11, 2009, Sierra Hide-Away filed a declaratory judgment action in California Superior Court, Madera County, seeking a order that Rogers could no longer reside in a mobile home in Sierra Hide-Away with her infant.[2]

On April 5, 2010, Rogers filed the complaint in this case, alleging claims for violation of the Fair Housing Act (42 U.S.C. § 3604(b)), the California Fair Employment and Housing Act (California Government Code § 12955(b)), and the Unruh Civil Rights Act (California Civil Code § 51 *et seq.*); unfair business practices (California Business & Professions Code § 17204); negligence; negligent interference with prospective economic advantage; intentional interference with prospective economic advantage; and invasion of privacy.

On April 6, 2010, Rogers's attorney deposed Seibert in the declaratory judgment action. According to Rogers, Seibert stated that he had made permanent copies of some video surveillance tapes, which he retained in his home. Immediately following the deposition, Rogers's attorney served Seibert with the summons and complaint in this case.

The relevant portion of the deposition reads as follows:

Q.   How many video surveillance cameras were installed?

A.   Well, we had seven installed, but I really only have three now, and I'm going to activate probably one other because four of them were attached to my own unit where I could observe them through my screen in my own home.

Q.   Now, the video surveillance cameras, does it record or is it just looking at–

A.   Um-hum, it does record and looks at live events.

---

[2] Although the complaint refers to Exhibit A, which sets forth 27 conditions and rules of Sierra Hide-Away in force when Rogers first leased her mobile home, and Exhibit D, which sets forth certain amendments to the rules, implemented by a vote of the residents in 2007, Rogers did not include these appendices with the copy of the complaint appended to her motion. According to the complaint, the 2007 amendment required that mobile homes in the park be owner occupied.

Q.      Let me ask you this: What type of media does it use to record?  Is it CD, DVD or what does it do?

A.      It records, like, onto a DVD and you can make hard copies of these things.

Q.      And how often do you have to change that DVD?

A.      It rotates.  It just keeps going.  You'd have–you would have to– it wipes out at the end of 30 days and starts over.

Q.      So in other words, it will run for 30 days straight and if you wanted to you could pull it out at that point and install a new one?

A.      No.

Q.      Does it start taping over itself after 30 days?

A.      Yes, yes, yes, yes.

Q.      Now, do you keep any of these tapes or you just let it –

A.      No.  What I do if there's things of interest to me that I want to record, I can go in and record those and just stick them in a file for future reference.  If there's nothing happening–let's say the person in unit No. 7 says somebody broke into my house.  Well, when do you think that happened?  Well, I think it happened two nights ago, we were gone.  I can go back and I can check the cameras and see what shows up and I can give them a copy to give to the sheriff.

Q.      Now, you mentioned that you sometimes might have need of making a hard copy.  Have you made any hard copies since–

A.      I've made a few.

Q.      And where are those kept?

A.      At my place, at my home.

Q.      And what were those few of?

[Defendants' counsel]: Objection.

A.      Nothing of any, you know–

By [Plaintiff's counsel]:

Q.      You mention that there were seven cameras and now there were only four, you say, or three?

A.      There's only three now.  The reason is we had–over in my office area we had three of those installed.  At my place, there was four installed.  So when I moved out of my place and had it all repainted and so forth, I took

///

4

those all off and we've done nothing with them.  So I am going to reinstall at some point, yes, I probably will, at least one.  Other than that, probably not.

Deposition of Leslie Seibert at 154:10-156:21 (April 6, 2010).[3]

Plaintiff's attorney asked no further questions regarding the content of the discs Seibert had downloaded, what Seibert meant by "things of interest to me that I want to record," or how many discs Seibert had downloaded from the surveillance system.

On June 2, 2010, Rogers requested that Seibert produce various documents, including "[a]ll permanent copies of any video surveillance of the Subject Rental Premises from April 1, 2005, to the present."  Although Seibert indicated that he would produce copies of the video recordings, he did not do so.  Rogers and Defendants' counsel met and conferred multiple times, but the video copies had not been produced by January 19, 2011, when Defendants moved to substitute Andrew W. Sorenson for their prior counsel.  On January 27, 2011, the Court granted Defendants' motion to substitute counsel and vacated the discovery end date of March 17, 2011.

On May 9, 2011, Seibert responded to Rogers's request for production of the surveillance video tapes, stating "[R]esponding party is unable to comply, because videotapes meeting the above request have been destroyed, ha[ve]been lost or replaced and are no longer in the possession, custody, or control of the responding party."  On August 5, 2011, the parties' counsel met and conferred regarding discovery requests but were unable to resolve the dispute concerning Rogers's request for the surveillance video recordings. Thereafter, Defendants' attorney again contacted Seibert and asked him to search again for any copies of video surveillance.  Seibert located three discs in the park office.  Of these, two had readable content.  On September 14, 2011, Seibert provided copies of these two computer discs to Rogers.

In a declaration prepared for this motion, Seibert stated that he initially had difficulty understanding the technology of the surveillance cameras, which retained images for several days before recording over them.  Surveillance images could be retained by making copies of portions

---

[3]  In his deposition, the surveillance camera installer, Gary Milner, explained that the cameras had to be monitored from two different location because the cable could not cross the driveway.  Deposition of Gary Milner at 25-26 (September 12, 2011).  As a result, the monitor for some of the cameras was installed in the office, which was on one side of the driveway, and a monitor for the rest of the cameras was installed in Seibert's mobile home, which was on the other side of the driveway.

of the tapes revealing activity of possible relevance.  Seibert tested the recording process and sent a disc copying a portion of the surveillance to his son Mark, who lived in Maryland.  Mark reported that the disc was not readable.  Seibert tried again.  The second disc revealed that the cameras were aimed too high and failed to show pedestrians' faces or the occupants or license plates of vehicles.  Thereafter, Seibert had the cameras' aims adjusted.  Mark discarded the discs.

Rogers contends that Seibert aimed two video cameras at her mobile home.  She maintains that because Sierra Tel, which initially installed the cameras, would not aim them to record activities within her home, Seibert had a resident, Pete Jarra, reposition the cameras to reveal her activities within her home.  In his September 12, 2011 deposition, Jarra denied that he positioned the security cameras to record activity at Plaintiff's home.

## II.   Spoliation of Evidence

"Parties may obtain discovery regarding nonprivileged matter that is relevant to any party's claim or defense –including the existence, description, nature, custody, condition and location of any documents or other tangible things."  F.R.Civ.P. 26(b)(1).  This includes electronically stored information, including photographs, from which information can be obtained either directly or through translation.  F.R.Civ.P. 34(a)(1)(A).  If a party has failed to comply with discovery, a party may move for an order compelling discovery after it has made a good faith effort to confer or attempt to confer with the party from whom the discovery is sought.  F.R.Civ.P. 37(a)(1).  If the party from whom discovery is sought does not fully comply with the court's order compelling disclosure, the party may move for sanctions pursuant to F.R.Civ.P. 37(b).  *See West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).  When an order compelling discovery has not been entered, a party may still apply for sanctions against another party for spoliation of evidence, that is, for destroying, altering, or failing to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.  *Id.*  When spoliation occurs in the absence of a discovery order, a court may impose sanctions pursuant to its inherent power.  *Leon v. IDX Systems Corp.*, 464 F.3d 951, 958 (9th Cir. 2006).  Plaintiff contends that, because Seibert destroyed or discarded discs composed of downloaded periods of electronic surveillance, sanctions are against defendants appropriate here.

6

1    A court may only levy sanctions for spoliation of evidence when the party knew or

2  reasonably should have known that the destroyed evidence was potentially relevant to the claim.

3  *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993).  Thus to sanction Defendants, the Court

4  must find that the discs that Seibert lost or destroyed discs at some time after Plaintiff served him

5  with the summons and complaint at the close of his deposition on April 6, 2010.

6    In her original motion, Plaintiff argues that Seibert must have done so because, "[d]uring

7  his deposition, Mr. Seibert openly admitted that he had made permanent copies of some of the

8  video surveillance tapes and kept them in his home."  Doc. 43 at 5.  Her contention was correct

9  as far as it went.  But analyzing the propriety of sanctions is complicated because, in his response

10  to Plaintiff's motion for sanctions, Seibert accounted for five discs: two had been reviewed and

11  destroyed by his son Mark well before the deposition and service of process in this matter, and

12  three (two of which were readable) had been located in the on-site office.  Defendants' attorney

13  copied the two readable discs and provided those to Plaintiff's counsel.

14    Despite Plaintiff's optimistic belief that the "few" discs that Seibert downloaded from the

15  surveillance system must have totaled more than the five discs of which Seibert finally provided

16  account, no evidence indicates that any additional discs were downloaded or destroyed.

17  Spoliation of evidence necessarily requires the existence of the evidence to lose or destroy.  "To

18  find that spoliation has occurred, a court must first find that the evidence previously existed."

19  *United States v. Universal Health Services, Inc.*, 2011 WL 2559552 (W.D. Va. June 28, 2011)

20  (No. 1:07CV000054).  Nothing in the record establishes the existence of any discs in addition to

21  those for which Seibert has accounted.

22    In her reply brief, Plaintiff argues that Seibert's production of discs found in the Sierra

23  Hide-Away office does not address Seibert's deposition testimony that he had made copies of

24  "things of interest to [him]" and kept them in his home.  Eager to document her belief that

25  Seibert was spying on her activities in and about her home, Plaintiff would have this Court

26  believe, as she apparently does, that the things of interest to Seibert must have been Plaintiff

27  herself.  Nothing in the deposition supports such a conclusion.  In fact, Seibert's testimony that

28  he recorded things that interested him is separate from his testimony that he had made and kept

1    discs containing footage downloaded from the surveillance system.  In describing the operation

2    of the surveillance system, Seibert testified to his ability to record things of interest to him,

3    immediately offering the example of his ability to go back a day or so to find footage relating to a

4    hypothetical resident's complaint of a burglary.  Later, after indicating that he made and retained

5    some discs, Seibert described their content as "nothing of any . . .," but Plaintiff's attorney cut off

6    any further response and did not further question Seibert about the discs' content.  That the disc's

7    content was nothing of importance or relevance would be consistent with Seibert's declaration

8    that he randomly copied video to be used to confirm that the system was working properly and

9    that the cameras were aimed as desired.

10          The apparent disparity of Seibert's testimony that he kept the discs in his home and the

11    fact that he eventually located them in the Sierra Hide-Away office to raise a red flag, despite

12    Plaintiff's insistence to the contrary.  Seibert testified that he kept the discs at home, but he could

13    not find them at home when he received the discovery request.  Later, he located the discs in the

14    park office.  He then provided Plaintiff with copies.  Nothing about this sequence of events is

15    inherently suspicious.

16          Plaintiff has simply failed to carry the burden of demonstrating that Seibert destroyed any

17    evidence following the April 2010 deposition for which he must be sanctioned.  "Plaintiff's

18    speculation that additional relevant [evidence] once may have existed and was deleted, without

19    any proof, is insufficient to establish that any relevant information was destroyed."  *Hare v.*

20    *Opryland Hospitality, LLC*, 2010 WL 3719915 at *18 (D. Maryland September 17, 2010) (No.

21    DKC 09-0599).

22          Plaintiff's motion to sanction Defendants for spoliation of evidence is HEREBY

23    DENIED.

24

25

26

27    IT IS SO ORDERED.

28    **Dated:   October 11, 2011                        /s/ Sandra M. Snyder**

1          UNITED STATES MAGISTRATE JUDGE

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28